WILLARD W. WHITE, APPELLEE AND CROSS-APPELLANT, v. WESTERN COMMODITIES, INC., APPELLEE AND CROSS-APPELLANT, AND CURTIS, INC., APPELLANT AND CROSS-APPELLEE.
295 N.W.2d 704

Filed August 15, 1980. No. 42903.

Michael O. Johanns and Peterson, Bowman & Johanns for appellant.

Baylor, Evnen, Baylor, Curtiss & Grimit for appellee Western.

Dennis M. Coll for Raymond, Olsen & Coll, P.C., for appellee White.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, and WHITE, JJ., and COLWELL, District Judge.

COLWELL, District Judge.

This is an appeal from an award made by the Workmen's Compensation Court in favor of Willard W. White, plaintiff, against Western Commodities, Inc. (Western), and Curtis, Inc. (Curtis), defendants. Defendant Curtis appeals; plaintiff and defendant Western cross-appeal. We affirm in part and reverse in part.

Plaintiff filed his petition with the Nebraska Workmen's Compensation Court on November 22, 1977, alleging a compensable injury from a fall on January 8, 1977, in Salina, Kansas, in the course of his employment as a truckdriver for Western. Western answered by general denial and, thereafter, with the consent of plaintiff, filed a third-party petition alleging that Curtis was either plaintiff's employer, or a joint employer of plaintiff with Western. Curtis answered denying that plaintiff was an employee. All issues were joined and hearing was had before a single judge of the Workmen's Compensation Court, who made an award in favor of plaintiff against both defendants as joint employers. Plaintiff refused the award and was granted a rehearing before a three-judge panel of the Workmen's Compensation Court. At trial the three-judge panel found that on January 8, 1977, plaintiff was jointly employed as a truckdriver by Curtis and Western when he suffered injuries to his back as a result of an accident arising out of and in the course of his employment by defendants when he slipped and fell from the truck-tractor frame; that as a result of that accident and injury the plaintiff incurred hospital and medical expenses and was temporarily totally disabled for a period of 62 3/7 weeks from January 8, 1977, to March 21, 1978, and, thereafter, suffered 10 percent permanent partial disability to his body as a whole. The panel found that at the time of the accident and injury the plaintiff was earning an average weekly wage of $250.36, entitling him to benefits of $100 per week for 62 3/7 weeks for temporary total disability and, thereafter, in addition thereto, the sum of $16.69 per week for 237 4/7 weeks for 10 percent permanent partial disability to the body as a whole. The panel also awarded plaintiff $400 com-

pensation for waiting time pursuant to Neb. Rev. Stat. § 48-125 (Reissue 1978), an attorney fee in the sum of $150, and an opportunity to avail himself of rehabilitation benefits pursuant to Neb. Rev. Stat. § 48-162.01 (Reissue 1978). The panel denied plaintiff's claim for expenses incurred while receiving treatments in a Veterans Administration hospital in the sum of $4,000, citing *Spiker v. John Day Co.*, 201 Neb. 503, 270 N.W.2d 300 (1978).

Curtis appeals from the award, assigning as error the failure to find that: (1) Curtis was not a joint employer; (2) The panel had no jurisdiction to determine the joint employer status of defendants; (3) Plaintiff was not injured in the scope of his employment with Curtis; and (4) Plaintiff was not entitled to workmen's compensation benefits.

Western cross-appeals, claiming as error: (1) The finding that plaintiff was a joint employee of Curtis and Western; (2) The failure to find that plaintiff was an employee solely of Curtis; (3) The failure to find that if plaintiff was entitled to any workmen's compensation benefits, those benefits were the sole obligation of Curtis; (4) The finding that there was no basis for reasonable controversy as to the first 8 weeks of plaintiff's disability and in awarding a waiting time penalty and attorney fees; and (5) The finding that plaintiff was entitled to vocational rehabilitation services.

Plaintiff cross-appeals, claiming that he should have been allowed the Veterans Administration hospital expenses.

"The findings of fact made by the Nebraska Workmen's Compensation Court after rehearing shall have the same force and effect as a jury verdict in a civil case." Neb. Rev. Stat. § 48-185 (Reissue 1978). "In reviewing the judgment of the compensation court, we are bound by the findings of fact made by that court after rehearing to the extent that the same have support in the evidence. Findings of fact made by the Workmen's Compensation Court after rehearing have the effect of a

jury verdict and we may not set them aside on appeal unless clearly wrong." *Wolfe v. American Community Stores,* 205 Neb. 763, 764, 290 N.W.2d 195, 197 (1980). See, also, *Hyatt v. Kay Windsor, Inc.,* 198 Neb. 580, 254 N.W.2d 92 (1977).

Plaintiff, now age 54, is an over-the-road truckdriver with more than 25 years experience, earning upwards to $200 per week. In 1945, he received a medical discharge from the U.S. Navy for a training injury described as a herniated intervertebral disc and received disability ratings ranging from 10 percent to 40 percent until 1953 when they were discontinued. Early in 1976, he became employed as a truckdriver by Platt Grain Co., Inc., Scottsbluff, Nebraska (Platt Grain), which was managed and operated by Bruce Platt (Platt). In 1976, Platt Grain was financially troubled and dissolved by law. In 1976, Platt formed Western which then carried on the former business of Platt Grain, and plaintiff became an employee of Western. At all times herein plaintiff claimed to be an employee of Western.

In December 1976, Platt negotiated leases of four truck-tractors to Curtis by separate written leases for 30-day renewable periods. The lease of the truck-tractor involved here shows Platt Grain Co., Inc., as lessor. Platt never divulged to Curtis that Platt Grain had been dissolved and that Western was its successor. The lease was signed in the Curtis home office in Denver, Colorado, and Platt was accompanied there by the plaintiff, who was interviewed by Curtis officers, completed an employment-type application form, and successfully completed a driver's examination required by Curtis.

The lease is on a printed form provided by Curtis. Most of the covenants therein relate to the duties and responsibilities of the lessor (Western). Also of significance is the following from the lease: "9. *It is the expressed intent of the parties that this agreement shall not create an Employer-Employee relationship, and the Lessor, his operators, drivers and employees shall be deemed to be*

*Independent Contractors during the entire term of this lease.*

"10. *Lessor shall carry a policy of Workman's Compensation and Employers' Liability insurance on himself, his operators, drivers and employees and said Lessor shall pay the premiums on said Policies.*

. . . .

"13. Lessor shall be responsible for the payment of all ... fees that may be assessed on the Lessor's personnel, equipment or the operation thereof.

"14. Lessor shall be responsible for the withholding of and the payment of all taxes, including, but not limited to, withholding taxes, social security taxes, unemployment insurance tax, ... against the Lessor, his operators, drivers or employees ....

. . . .

"18. Lessor may, on behalf of Curtis, *hire or employ properly licensed operators or drivers,* to operate the above described equipment. All operators and drivers are subject to approval by Curtis ....

. . . .

"21. The lessor, his operators, drivers and employees, with respect to the movement of traffic on this equipment, shall at all times be subject to the control, management, direction and orders of Curtis." (Emphasis supplied.)

On January 3, 1977, plaintiff left Scottsbluff, Nebraska, driving the leased truck-tractor hauling a Curtis-owned trailer with cargo to Jackson, Mississippi, where he received instructions from Platt to pick up a backhaul load of fresh chickens for delivery to Billings, Montana. On the backhaul trip plaintiff stopped at a Salina, Kansas, truck stop on January 8, 1977, during a snowstorm; the temperature was below zero. Mechanical trouble developed with the truck-tractor brakes and with the refrigeration unit (reefer) on the front of the trailer. While standing on the truck-tractor frame changing the filters on the reefer, plaintiff slipped and fell to the ground, where he laid for about 30 minutes.

Plaintiff claims that he injured his shoulder and back and that he suffered frostbite to his face. Fellow truckers helped him to his truck cab. He notified Platt of the accident and his injury and stayed 2 days in Salina, Kansas, in the truck cab. He then drove to his home in Minatare, Nebraska, where Platt picked up the truck-tractor and the trailer. Plaintiff has never driven a truck since.

There is no merit to the claim by Curtis that the Workmen's Compensation Court had no jurisdiction to consider the joint employer issue presented by the pleadings. Such an issue is proper under Neb. Rev. Stat. §§ 48-129 and 168 (Reissue 1978) and the objection was not timely raised by Curtis until its appeal to this court.

We first consider the question of the identity of plaintiff's employer for workmen's compensation purposes, and whether or not defendants were joint employers.

As a general rule the right of control is a key consideration in determining whether the relationship of employee and employer exists. See *Gardner v. Kothe*, 172 Neb. 364, 109 N.W.2d 405 (1961).

In addition to the lease terms, there was other evidence of control: (1) Duties of White. On a trip White was required to contact Curtis on a daily basis to advise as to (a) His location; (b) The nature of the cargo; and (c) The temperature of the trailer. White maintained a log in the manner required by Curtis; Curtis advanced money to White for truck and trailer expenses and traveling expenses, which was later deducted in settlement with Platt; White contacted Platt every 2 days; in the event of a truck breakdown Platt was contacted; in the event of a breakdown of the trailer Curtis was notified; where a backhaul was arranged by Curtis, White would secure authorization from Platt; and Platt could refuse a Curtis load if not satisfactory with him. (2) Wage arrangement. White was originally employed by Western at the agreed rate of 10½ cents per mile; Western always paid White's wages and provided Social Security, unemployment, and workmen's compensation insurance; Western provided W-2 forms; Western was always claimed by White as his

employer. (3) Hiring and replacement of driver. If Curtis was dissatisfied with White, or any other driver furnished with a truck, Curtis could discontinue the services of such driver and advise Platt, who would provide a replacement. Curtis could not discharge any driver who was an employee of Western. Platt could assign White to other duties and provide another driver for the leased truck, if such driver was qualified and acceptable to Curtis. Curtis could not hire a driver for a Western truck. Platt hired all drivers.

In its award the panel followed the modern rule stated in 1C Larson, Workmen's Compensation Law § 48.40 (1980): "Joint employment occurs when a single employee, *under contract with two employers*, and under the simultaneous control of both, simultaneously performs services for both employers, and when the service for each employer is the same as, or is closely related to, that for the other. In such a case, both employers are liable for workmen's compensation." (Emphasis supplied.) Larson explains: "Joint employment is possible, and indeed fairly common, because there is nothing unusual about the coinciding of both control by two employers and the advancement of the interests of two employers in a single piece of work. . . . [T]he lessor may be accomplishing his business purpose of furnishing equipment and labor at a profit, while the lessee is at the same moment accomplishing his business purpose of transporting goods . . . and the lessor may retain enough control to safeguard his interest in the valuable equipment, while the lessee may assume enough control to get his work done efficiently." A footnote to the foregoing rule cautions that Nebraska statutory provisions on joint employment should be considered.

Section 48-129 provides, in part: "In case any employee for whose injury or death compensation is payable under this act, shall, at the time of the injury, *be employed and paid jointly by two or more employers* . . . such employers shall contribute to the payment of such compensation in proportion to their several wage liabilities to such em-

ployee. . . . *Provided, however,* nothing in this section shall prevent employers from making any arrangement between themselves for a different distribution of the ultimate burden of compensation." (Emphasis supplied.)

"In the absence of any showing that there was any joint arrangement as to salary, wages, hours of employment, or term of service, there cannot be any joint employment . . . ." *Henning v. City of Hebron,* 186 Neb. 381, 384, 183 N.W.2d 756, 759 (1971).

Neb. Rev. Stat. § 48-115(2) (Reissue 1978) defines an employee as "Every person in the service of an employer who is engaged in any trade, occupation, [or] business . . . under any contract of hire, expressed or implied, oral or written . . . ."

There is a rationale here with the line of cases involving "special employees," where the rule is: "[T]here must be some consensual relationship between the loaned employee and the employer whose services he enters, sufficient to create a new employer-employee relationship. Where an employee enters the service of another at the command and pursuant to the direction of the master, no new relationship is created." *Shamburg v. Shamburg,* 153 Neb. 495, 502, 45 N.W.2d 446, 451 (1950).

Defendants here dealt at arms length in their lease agreement, including the provision that Western (lessor) was to be the employer of truckdrivers for workmen's compensation purposes. The evidence supports that agreement and there is no showing of prejudice to plaintiff who was not privy thereto; in fact, that was the desire and understanding of plaintiff. Such agreement should be accorded considerable weight in determining the issue of employment as contemplated in § 48-129.

The record here shows that there was no contract of employment between plaintiff and Curtis, either express or implied; that plaintiff was not paid jointly by defendants; and that defendants did not have an agreement as to plaintiff's salary and wages. On the contrary, plaintiff met his burden of proof that on January 8, 1977, Western had the right of control and plaintiff was its employee.

The finding of the panel that defendants were joint employers of plaintiff was clearly wrong.

We next consider whether plaintiff incurred a compensable injury and the extent and cause thereof. Plaintiff is the only person who personally appeared and testified.

Plaintiff said that he has had pain in his back, left leg, and shoulder from the time that he fell from the truck-tractor; that prior to January 8, 1977, his service-connected injury occasionally caused him some pain when he overexerted himself in his work, but that he put up with the pain and continued to work regularly until his injury on January 8, 1977, which aggravated his condition so that he could not drive a truck. Following plaintiff's return to Minatare, Nebraska, he remained at home applying home remedies until January 26, 1977, when he saw Dr. Joe T. Hanna, M.D., who referred him to the Veterans Administration hospital at Cheyenne, Wyoming. Thereafter followed a series of treatments and confinements in Veterans Administration hospitals at Cheyenne, Wyoming, and Hot Springs, South Dakota, beginning with Dr. S. E. Dahlstrom, M.D., who noted a history of "low back syndrome and discogenic disease since 1945, gradually becoming more disabling." During the next 6½ months he was examined and treated by more than six VA doctors whose records show that plaintiff was 5 feet 10 inches tall and weighed 250 pounds; his complaints were chronic low back pain beginning with his 1945 service injury; tenderness in the lumbosacral region; no deformities; back pain probably due to obesity; and atrophy of left leg noticed soon after the service injury. The diagnosis was lumbosacral sprain. No surgery was recommended. On June 22, 1977, Dr. Dahlstrom noted that plaintiff could return to work in 3 or 4 weeks.

Plaintiff was confined at the Cheyenne VA hospital from August 8 to October 17, 1977, under the care of Dr. E. W. Rideout, Jr., M.D., who continues outpatient care. It was at this time that the medical records first

have reference, in plaintiff's personal history, to the January 8, 1977, accident, although plaintiff testified that he had furnished this information to Dr. A. J. Grant, M.D., in March 1977. Also, during this time, plaintiff's service disability was reinstated to 40 percent. Dr. Rideout's diagnosis was that plaintiff had chronic lumbosacral sprain. When plaintiff was discharged on October 17, 1977, he was ordered not to return to work.

Relating to March 1978, Dr. Rideout, by deposition, said: "The last time I saw Mr. White, and I have no reason to believe that things are any different right at this instant, he was at least temporarily totally disabled as far as occupation that he is capable of doing, that is, truck driving and manual labor and so forth." He also gave his opinion that he did not know how long that condition would last. His deposition continues: "Q. And based upon that history given by Mr. White to you, do you have an opinion as to the injury that caused Mr. White's discomfort that you first saw him in August of 1977? ... A. I think Mr. White had a preexisting back condition from his service, with which he had worked almost continuously until January 8th, 1977, at which time he fell from his truck, was injured, and has been unable to work since that time."

Subsequently, on January 18, 1979, Dr. Rideout also related that he had examined plaintiff on June 30 and October 30, 1978, and he gave this opinion as to plaintiff's ability to work: "My opinion was that that man wasn't able to work." and "Q. At that time, doctor, you said that he was not able to return to work at that time. Now, based upon your medical experience, is that inability to go back to work a service connected injury in 1945 or an injury that occurred in January of 1977? ... THE WITNESS: I can't separate the two."

Dr. Edward J. Salmeri, M.D., Veterans Administration hospital, Cheyenne, Wyoming, examined plaintiff at the hospital between August 9 and 14, 1978, and it was his opinion that when plaintiff was discharged from the hospital he could work.

Dr. Emil J. Massa, M.D., an orthopedic surgeon, Denver, Colorado, testified by deposition for Western that he examined plaintiff on March 21, 1978, and concluded that there were no objective findings, but that plaintiff had sustained a lumbosacral sprain as a result of the January 8, 1977, incident. Further, it was his opinion that plaintiff had reached maximum medical recovery from the sprain, that plaintiff had no disability attributable from that sprain, that plaintiff could return to work as a truckdriver, and no further orthopedic therapy or treatment was indicated.

The burden of proof is on the plaintiff to show by a preponderance of the evidence that the injury sustained was caused by, or related to, the accident and was not the result of the normal progression of the plaintiff's preexisting condition which would have been sustained in the absence of the accident. *Taylor v. Benton*, 205 Neb. 203, 286 N.W.2d 755 (1980). See, also, *Breed v. Interstate Glass Co.*, 188 Neb. 284, 196 N.W.2d 169 (1972). Plaintiff's burden of proof is enhanced by reason of his prior injury. *Brokaw v. Robinson*, 183 Neb. 760, 164 N.W.2d 461 (1969).

"The requirement that objective symptoms of an injury be produced 'at the time' of the accident is satisfied if the symptoms manifest themselves according to the natural course of such matters without any independent intervening cause being shown. . . . There is no statutory requirement that the symptoms be observed by others or that the existence of the symptoms be proved by independent testimony." *Salinas v. Cyprus Industrial Minerals Co.*, 197 Neb. 198, 202, 247 N.W.2d 451, 453 (1976).

Western strongly urges that the findings of the three-judge panel on causation, injury, and extent of the injury were based upon speculation, arguing that there were no objective symptoms of injury; that the injury, if any, was the result of plaintiff's prior service-connected injury; great conflict in the hospital and medical records; the lack of credibility of medical opinions; and

inconsistent opinions by medical experts. While the proof of these issues is in conflict and not clear-cut, there is evidence in the record that preponderates in favor of plaintiff, supporting the award, *Welke v. City of Ainsworth*, 179 Neb. 496, 138 N.W.2d 808 (1965), and we cannot say that such findings were clearly wrong. Further, those findings are in keeping with *Bekelski v. Neal Co.*, 141 Neb. 657, 4 N.W.2d 741 (1942). "The primary purpose of the workmen's compensation act is to insure an employee against accidental injury arising out of and in the course of his employment. To accomplish this purpose the act should be liberally construed, not to find that liability exists without the required quantum of proof, but to include within the protection of the act by liberal interpretation all injuries arising out of and in the course of the employment which the act does not clearly exclude. A strict interpretation should not be resorted to in order to accomplish such exclusion." *Id.* at 659, 4 N.W.2d at 743.

We have considered the other assigned errors and find that they are without merit in that those findings of the panel have support in the evidence.

The third-party petition should be dismissed and Curtis discharged as a party defendant. The award and allowances otherwise made by the three-judge panel are affirmed.

Plaintiff is allowed $750 for the services of his attorney in this court.

AFFIRMED IN PART, AND IN PART REVERSED.