GLENN BENDER, APPELLEE, V. NORFOLK IRON & METAL COMPANY, APPELLANT.

400 N.W.2d 859

Filed February 13, 1987.   No. 86-095.

Lynn A. Melson and Walter E. Zink II of Baylor, Evnen, Curtiss, Grimit & Witt, for appellant.

Vince Kirby, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

This is an appeal in a proceeding under the Workers' Compensation Act. The plaintiff, Glenn Bender, was injured on October 31, 1984, while employed by the defendant, Norfolk Iron & Metal Company, as a shearer and breaker operator. While cutting metal sheets, a 700- to 800-pound section fell upon the toes of the plaintiff's right foot. It is undisputed that the accident arose out of and during the course of the plaintiff's employment. The plaintiff returned to work on April 15, 1985, as a crane operator rather than a shearer. Two weeks later, the employment relationship terminated as a result of a dispute concerning an unrelated issue.

After leaving his employment the plaintiff applied for and received unemployment compensation benefits for 3 to 4 months. During this time, the plaintiff was required to and did look for work. Plaintiff testified that he was still on crutches during this period and received no offers of employment.

After the hearing before a single judge, the plaintiff recovered an award for temporary total disability, medical and hospital expenses, and vocational rehabilitation services.

Upon rehearing, the plaintiff again recovered an award for temporary total disability, medical and hospital expenses, vocational rehabilitation services, and an attorney fee.

Both awards found that the plaintiff had been temporarily totally disabled from the date of the accident until the date of the hearing, except for the 2-week period when the plaintiff returned to work as a crane operator, and would remain temporarily totally disabled for an indefinite time.

The defendant has appealed and has assigned as error the findings that the plaintiff's present disability is causally related to the accident of October 31, 1984, and that the plaintiff is entitled to vocational rehabilitation services.

The plaintiff testified that his return to work on April 15, 1985, as a crane operator was on a trial basis until he left the company on April 29, 1985; that he continued to seek medical treatment after he went back to work; and that he was still

under medical care on the day of the rehearing and contemplated further medical treatment.

The plaintiff further testified that he could not stand on his injured foot for long periods of time because when he did so he experienced throbbing pain. He also reported occasionally experiencing a sharp pain in his foot during the night.

The plaintiff has a high school diploma and is 29 years old. He has had no training for work other than manual labor and testified that he is now unable to lift and cannot bear weight on his right foot for any extended period of time.

The plaintiff was originally treated by Dr. Charles Henkel, an orthopedic surgeon, who referred the plaintiff to Dr. Dwight Frost on June 26, 1985. Dr. Frost testified by deposition that he began treating the plaintiff on June 26. His examination of the plaintiff's foot revealed that there had been an open reduction and fusion of the joint between the knuckle of the toe and the base of the foot and that the incision over the top of the great toe was well healed. Palpation of the forefoot showed the area to be tender, and both active and passive movement of the toes was painful. Movement of the transverse and longitudinal arches was also painful. An x ray revealed the fractures of the second through fourth toes and that the great toe was healing.

Dr. Frost recommended that the plaintiff begin physical therapy, and the plaintiff was instructed to use crutches to avoid putting his weight on the right foot. An anti-inflammatory drug was prescribed.

At the next examination 3 weeks later, the plaintiff's foot was still hypersensitive and he still experienced pain when bearing weight on the right foot. Dr. Frost ordered a custom-made insert for the plaintiff's shoe, to properly support the foot and alleviate the pain. The plaintiff was instructed to continue his medication, the use of crutches, and a less intensive course of physical therapy.

The plaintiff was examined 1 week later to determine the effectiveness of the insert. Dr. Frost concluded the plaintiff was not responding to physical therapy and the insert was not providing the intended relief. Dr. Frost testified that, at that time, he "began to suspect . . . [the plaintiff] had what we call a sympathetic dystrophy, which means a reflex persistence of

pain." He further testified the plaintiff could not do much physical activity at that time, either of a "weight bearing or mobile nature, because he's handicapped both ways." Dr. Frost later testified that "the problem here has become one of this sympathetic dystrophy. And it happens to be involved with pain."

When asked to what extent the autonomic nervous system had affected the plaintiff, Dr. Frost replied, "I think it perpetuates his pain." His prognosis for recovery was "fair to good, depending upon the chronicity." Dr. Frost went on to describe typical responses to this condition as well as various treatments, and testified that he had recommended a sphenopalatine ganglion block to interrupt the plaintiff's sympathetic dystrophy.

Dr. Frost then testified that, in his opinion, the plaintiff could not be involved in any type of activity with mobility, such as lifting or walking, because his condition required the use of crutches. This condition was present at the time of the initial examination and at the time of the rehearing. His prognosis for the plaintiff was guarded and dependent upon his response to the proposed treatment.

On cross-examination Dr. Frost testified that after trying the insert and crutches, he had asked Dr. Henkel to place the foot in a cast for 6 weeks to see if the plaintiff would respond, because "Sometimes these autonomic bouts will subside. And in his case it did not." The defendant's attorney asked Dr. Frost, "[I]s it the sympathetic dystrophy, is that what it is?" to which the doctor responded, "Yes, sir."

The medical evidence which has been summarized is sufficient to support a finding that the plaintiff's present disability is causally related to the accident of October 31, 1984. The findings of fact made by the compensation court have the same force and effect as a jury verdict in a civil case and will not be set aside unless clearly wrong. *Hollinger v. Consolidated Motor Freight*, 223 Neb. 449, 390 N.W.2d 518 (1986); *Wilson v. City of North Platte*, 221 Neb. 90, 375 N.W.2d 134 (1985). Further,

> In testing the sufficiency of the evidence to support the findings of fact made by the Nebraska Workmen's

Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be drawn therefrom.

*Id*. at 92, 375 N.W.2d at 137 (citing *Buck v. Iowa Beef Processors, Inc.*, 198 Neb. 125, 251 N.W.2d 875 (1977)).

The compensation court's finding of a causal connection was not clearly wrong. There was sufficient evidence from which the court could find the plaintiff's present disability was the result of the October 31, 1984, accident.

While Dr. Frost's testimony was not as specific as it could have been, it was sufficient for the compensation court to find the sympathetic dystrophy was a result of the accident. Viewing the evidence in the light most favorable to the plaintiff, as we are required to do, the evidence was sufficient to support the compensation court's finding of a causal connection between the plaintiff's present disability and the accident of October 31, 1984.

The defendant's second assignment of error concerns the award of vocational rehabilitation services.

The right of an injured workman to receive vocational rehabilitation benefits depends upon his inability to perform work for which he has previous training and experience. Neb. Rev. Stat. § 48-162.01 (Reissue 1984). See, also, *Smith v. Hastings Irr. Pipe Co.*, 222 Neb. 663, 386 N.W.2d 9 (1986); *Evans v. American Community Stores*, 222 Neb. 538, 385 N.W.2d 91 (1986). This is ordinarily a question of fact for the determination of the compensation court. *Pollock v. Monfort of Colorado*, 221 Neb. 859, 381 N.W.2d 154 (1986). However, when there is insufficient evidence to support an award, this court must modify, reverse, or set it aside. Neb. Rev. Stat. § 48-185(3) (Reissue 1984).

In this case the award of vocational rehabilitation services is premature. Dr. Frost, the sole medical witness presented by the plaintiff, testified that he was unable to determine, at that time, whether the plaintiff would be permanently disabled. Such a determination, he stated, was dependent upon the plaintiff's response to the prescribed treatment. It was his opinion that if

the plaintiff responded to the treatment "the likelihood of his being able to return to the job that he once had is good." This evidence will not support an award of vocational rehabilitation services. That part of the award must be reversed.

The award of vocational rehabilitation services is reversed, and the award is, in all other respects, affirmed.

AFFIRMED IN PART, AND

IN PART REVERSED.